**DUNN et al. v. DUVAL TEXAS SULPHUR CO. et al.**

**No. 10703.**

Court of Civil Appeals of Texas. Galveston.

May 11, 1939.

Rehearing Denied July 31, 1941.

Ike S. Handy, of Houston, for appellant Federal Royalty Co.

Walter F. Brown, of Houston, for appellant L. H. Dunn and others.

Vinson, Elkins, Weems & Francis, Fred R. Switzer, and Simon Frank, all of Houston, for appellee Duval Texas Sulphur Co.

Edwin Hawes, Jr., of Wharton, for appellee Marion B. Cloud and another.

CODY, Justice.

This suit involves the construction of a contract and the determination of whether the court erred in dismissing the jury and rendering the judgment sought by appellees.

The suit was brought by appellants, L. H. Dunn, C. E. Lawhon, and Riverside Royalty Company, in the district court of Harris County, Texas, against the appellees, Duval Texas Sulphur Company, Marion B. Cloud, and Joe Davidek, and against appellant, the Federal Royalty Company, for the construction and enforcement of a contract with the aforesaid Duval Texas Sulphur Company, which will hereafter be sometimes referred to as the Duval Company. Margaret Averill intervened, basing her claim as an assignee of a part of C. E. Lawhon interest, and adopted Lawhon's pleadings.

The plaintiffs alleged as the true meaning of the contract what they contended it meant, as hereafter indicated; and, alternatively, that if the contract did not clearly and unambiguously mean what they contended, then it was ambiguous, and its meaning was in fact as contended for by plaintiffs; they further alleged, in the alternative, that if the contract did not mean what plaintiffs contended it meant, that then, through accident or mistake of the parties, or through fraud on the part of the Duval Company and accident and mistake on the part of Dunn and the Federal Royalty Company, the contract did not express the true agreement of the parties, and should be reformed to make it do so.

The Duval Company, so far as is material to this appeal, answered by general demurrer and general denial.

The Federal Royalty Company sought the same relief against the Duval Company as did plaintiffs, and filed a cross-action against appellee Davidek and appellee Cloud.

We now state the pertinent facts about which there is no dispute:

In the summer of 1932 it was agreed between Dunn and the Duval Company acting through its manager, Zoffman, that Dunn (and his associates) should endeavor to assemble a block of leases on what is now known as the Boling Sulphur Dome in Wharton County. Dunn was to receive an overriding royalty of $1 per ton on sulphur on leases he should transfer to the Duval Company except that, with respect to tracts on which only a fractional part of the sulphur should be acquired, a different overriding royalty should be given him. A producer of sulphur, where he owns less than 100% of the sulphur rights in a tract from which he produces sulphur most incur the same cost of operation in the production of sulphur as though he owned 100% of the sulphur produced therefrom, but his profit is confined, of course, to what he can make on his portion of the sulphur which he produces; for the most that he can hope to get from the other joint owners of the sulphur rights in such tract is that they will repay him the cost to him of producing their sulphur for them. So, to meet the situation of divided ownership of the sulphur rights in a tract, the parties agreed upon a formula by which to reduce the overriding sulphur royalty that should go to Dunn (and which should be less than $1 per long ton) in connection with those tracts in which he should fail to get leases covering 100% of the sulphur rights. It is in connection with the agreement as to when such formula should apply, that the controversy has arisen. On December 22, 1932, Dunn assigned to the Duval Company the leases which he had secured, the parties reduced their agreement to writing, as follows (though oil royalties are provided for in the agreement also, we are practically concerned only with sulphur):

"The State of Texas }
County of Wharton }

"Whereas, by assignment of even date herewith and which is referred to and made a part hereof for all purposes, L. H. Dunn, of Harris County, Texas, has assigned,

transferred and conveyed unto Duval Texas Sulphur Company all those certain oil, gas and mineral leases covering lands and mineral interest in Wharton County, Texas, specifically described as follows, to-wit: (Here follows a description of the leases assigned).

"And Whereas, said assignment to Duval Texas Sulphur Company does not fully express the understanding and agreement between the said L. H. Dunn and Duval Texas Sulphur Company, and it is desired that the exact understanding and agreement between said parties with reference to said leases shall be fully set out in writing:

"Now, Therefore, Know All Men by These Presents: That for and in consideration of the premises and of the sum of Twenty-Five Hundred Dollars ($2500.00) cash in hand paid by Duval Texas Sulphur Company to L. H. Dunn, the receipt of which is hereby acknowledged, the said L. H. Dunn, hereinafter referred to as 'First Party', and Duval Texas Sulphur Company, hereinafter referred to as 'Second Party', hereby agree as follows:

"I. Second Party is hereby given the right and option for a period of ninety (90) days from the date hereof to purchase from First Party all of the above described and referred to oil, gas and mineral leases and mineral interests covering lands in Wharton County, Texas, together with the right and option, during said period, to purchase from First Party such other oil, gas and mineral leases and mineral interests which First Party may acquire in that certain area in Wharton County, Texas, hereinafter referred to as the 'contract area', and which is colored red on the map or plat attached hereto and made a part hereof, under the terms and conditions hereinafter set out.

"II. During said ninety (90) day period, First Party Agrees to use his best efforts to secure oil, gas and mineral leases or mineral conveyances covering all of said contract area, including all outstanding mineral interest or leases on such mineral interest in the tracts of land above described and in which the leases or conveyances now held by First Party do not cover the entire mineral interest. And such leases so acquired shall be on the same form and contain the same terms and conditions as the leases set out hereinabove and shall contain not to exceed the royalties specified therein, that is to say, one-eighth (⅛) of the oil, gas and other mineral, except sulphur, and One Dollar ($1.00) per long ton on sulphur on the full one hundred per cent. interest. Whenever any such leases or mineral interests are acquired by First Party, he shall immediately assign the same to Second Party, and in case Second Party exercises its option to purchase such leases or mineral interests, it shall, at the time of exercising such option, reimburse First Party the actual cost of acquiring such leases or mineral interests, but not to exceed in any case an average cost of Five Dollars ($5.00) per acre for the full one hundred per cent. mineral interest except with express consent of Second Party. Second Party shall have the right, during said period of time, to secure leases or conveyances covering any and all mineral interest in said contract area not secured by First Party, and may, if it desires, take the same in the name of First Party, but shall pay the entire cost thereof.

"III. (This paragraph has to do with procurement of title, examination of titles, and curing of title defects, and is omitted).

"IV. If Second Party exercises its option to purchase from First Party the oil, gas and mineral leases and mineral interests hereinabove described and this day assigned by First Party to Second Party, together with any other leases and mineral interests acquired during said period by First Party in said contract area, the above mentioned sum of Twenty-Five Hundred Dollars ($2500.00) this day paid by Second Party to First Party shall constitute the entire cash consideration to be paid by Second Party to First Party for the leases and mineral interests hereinabove set out, and no further cash consideration shall be paid by Second Party to First Party except such payment as is hereinabove required to be made for additional leases and mineral interests hereafter acquired by First Party and assigned to Second Party, and First Party shall execute any and all additional conveyances or assignments which may be necessary to fully and completely vest Second Party with title to all of said oil, gas and mineral leases and mineral interests, and First Party and Second Party shall enter into an agreement setting out the terms and conditions upon which said leases and mineral interests shall be held by Second Party and setting out the rights and interests of First Party therein, which shall be upon the following terms and conditions:

"(a) Second Party shall begin operations for the drilling of the first test well for sul-

phur in the contract area within a period of fifteen (15) days from the exercise of its option and continue the same with reasonable diligence to completion, in a bona fide effort to locate a deposit of sulphur in said contract area, and after the completion of said first well, shall continue drilling operations in said contract area in accordance with the stipulations contained in the various leases hereinabove set out.

"(b) After the prospecting period, as set out in said leases, has been completed and Second Party has determined upon the erection of a plant for the production of sulphur, said Second Party obligates itself to install a steam plant having a rating of two thousand (2000) boiler horsepower, which will be operated at its rated capacity or better and which should deliver approximately nine hundred thousand (900,000) gallons of hot water per day of twenty-four (24) hours, and which is to be used diligently and practically in the production of sulphur from said contract area.

"(c) First Party shall be entitled to an overriding royalty on oil, gas and other minerals, except sulphur, equal to one twenty-fourth (1/24) of such oil, gas and other minerals produced and saved from any of the leased premises or mineral interests acquired either by First Party or Second Party in said contract area, which is to be paid or delivered in the same manner as the lessors' royalty interest and which will be vested in First Party by proper terms of conveyance from Second Party. It is agreed, however, that this one twenty-fourth (1/24) overriding royalty is based on a full one hundred per cent. ownership of the oil, gas and other minerals, and in case the interest in the minerals conveyed and assigned by First Party to Second Party, plus such interest as Second Party may hereafter acquire from First Party or elsewhere, is less than the full one hundred per cent. mineral interest, then First Party's said overriding royalty shall be decreased proportionally.

"(d) First Party shall be entitled to receive an overriding royalty of One Dollar ($1.00) per long ton on Sulphur produced and saved from any of the above described leased premises or mineral interests, and from any other leases or mineral interests acquired by Second Party in said contract area, which shall be paid to him in the same manner as the land owner's royalty, and which overriding royalty interest shall be vested in First Party by proper terms of conveyance from Second Party to First Party. It is agreed, however, that said overriding royalty interest is based on the full one hundred per cent. ownership of the sulphur interest in the various tracts of land in said contract area, and in case the interest in any specific tract of land assigned to Second Party by First Party plus any interest therein acquired by Second Party shall be less than one hundred per cent. of the sulphur rights therein, then First Party's overriding royalty interest payable on the sulphur produced and saved from said tract shall be reduced and shall be determined in the following manner: The sum of the fractional interest in the sulphur in said tract delivered by First Party to Second Party, plus the fractional interests therein acquired by Second Party, expressed in decimals, shall be multiplied by the sum of such fractional interests expressed in cents, and the result shall be the number of cents per long ton in sulphur to be paid by Second Party to First Party as an overriding royalty on the sulphur produced and saved from such tract. In other words, if First Party delivers to Second Party a fifty per cent. interest in the sulphur in a specific tract and Second Party acquires no additional interest, the overriding royalty to be paid to First Party shall be .50 x 50c or 25c. In case Second Party acquires an additional twenty per cent. interest in the sulphur, the overriding royalty to be paid to First Party shall be .70 x 70c or 49c and so on for all other fractional interests. It is further agreed, however, that the total royalty to be paid by Second Party on the sulphur produced from any particular tract of land band based on the full one hundred per cent. mineral interest therein shall never exceed Two Dollars ($2.00) per long ton, including the land owner's royalty as well as the overriding royalty which First Party is entitled to and including any other royalties or overriding royalties which may have to be paid thereon, except that in case Second Party should elect to pay royalties and overriding royalties in excess of Two Dollars ($2.00) per long ton on sulphur produced from any particular lease, First Party's overriding royalty interest shall not be reduced below the amount he would otherwise be entitled to on the interest actually delivered by First Party to Second Party. In case First Party secures leases covering any particular tract of land providing for a total royalty to the lessors in excess of One Dollar ($1.00) per long ton of sulphur based on one hundred per cent. ownership, such amount of royalty in excess of One

Dollar ($1.00) per long ton shall be deducted from the overriding royalty First Party is entitled to on the sulphur produced from said tract.

"(e) In case the above described oil and gas leases and mineral interests and those afterwards acquired by Second Party, or any part thereof, shall be consolidated and operated as a unit, as is provided for under the terms of said oil, gas and mineral leases, then the amount of overriding royalty payable to First Party from sulphur produced from such consolidated acreage of 'sulphur community lands' shall be determined in the same manner provided in said leases for determining the land owner's royalty thereunder.

"(f) All royalties on sulphur, gas and other minerals which may become due First Party hereunder shall be paid to him by Second Party, its successors or assigns, on or before the 20th day of each month for all of such sulphur, oil, gas and other minerals produced and saved during the preceding month.

"(g) Should Second Party at any time desire to sell or assign to any other person or company the leases and mineral interests covered hereby, it shall guarantee to First Party the continued operation of such properties according to the capacity of the plant above mentioned and which operation is to continue until the known sulphur deposits under said lands and leases become depleted and such obligation shall then be cancelled. Thereafter the terms and conditions of the leases referred to above are to govern as to any continued operation or development of the properties.

"(h) In the event a sufficient deposit of sulphur is found to exist under the lands leased from Marion Cloud and Joe Davidek referred to above, so that their portion of the royalties therefrom will be in excess of the amounts hereinafter specified, then Second Party obligates itself to pay to the said Marion Cloud and to the said Joe Davidek, within six (6) months after the actual production of sulphur has begun, each the sum of Fifteen Thousand Dollars ($15,000.-00) as advance royalty, which amount is to be deducted by Second Party from sulphur royalties thereafter accruing to their accounts, provided, however, that this provision shall not apply as to either of said parties in case he sells or disposes of his interest prior to that time; and if either of said parties sells or disposes of a portion of his interest, the obligation of payment shall proportionately pass to the new owner thereof, in proportion to the interest purchased. At the time payment is made, said parties, their heirs or assigns, shall execute such instruments as may be required to place of record, so as to protect Second Party against repayment of said amounts to any subsequent purchaser or owner of the mineral interests of the said Marion Cloud and Joe Davidek.

"(i) If at any time after the exercise by Second Party of the option hereinabove granted, First Party should acquire any other oil, gas and mineral leases or mineral interests in said contract area, then he shall assign the same to Second Party upon the repayment of the actual cost to him, which shall not exceed an average of Five Dollars ($5.00) per acre for the full one hundred per cent. (100%) mineral interest without the consent of Second Party, and all such leases or mineral interests shall thereupon become a part of this agreement just as if fully incorporated herein, and the provisions above set out with reference to overriding royalties shall also apply thereto; and in case Second Party should hereafter acquire any oil, gas or mineral leases or mineral interests covering lands in said contract area, the above referred to provisions with reference to payment of overriding royalties to First Party shall also apply thereto just as if said leases and mineral interests had originally been covered thereby.

"(The remainder of the agreement is not material on appeal, and so is omitted)."

The Texas Gulf Sulphur Company and the Gulf Production Company and others owned the fractional interests in the tracts in which Dunn acquired less than the total sulphur rights; and in early January, 1933, Zoffman (manager of the Duval Company), L. H. Dunn, and Lee Hager, President of the Federal Royalty Company, agreed that Zoffman should undertake to acquire the fractional interests outstanding, and the following letter represents the memorandum or modification of the agreement arrived at between the parties:

"January 20, 1933.
"Duval Texas Sulphur Company,
"Esperson Building,
"Houston, Texas.
"Gentlemen:

"On December 22, 1932, an agreement was entered into between your company and L. H. Dunn with reference to certain sulphur and mineral leases in Wharton Coun-

ty, Texas, fully described therein, in which the said L. H. Dunn agreed to use his best efforts to secure additional leases covering lands in the same area and covering outstanding interests which had previously been secured.

"L. H. Dunn has been unable to secure the additional leases and additional interests, and you are hereby authorized to proceed, as you may see fit, to secure these leases and outstanding interests through the efforts of your company, or its agents; and in securing such additional leases and interests we hereby authorize you, in accordance with the provisions of said contract, to utilize, if in your judgment it becomes necessary in securing any such lease or interest, all or any part of any overriding royalties which we would be entitled to under said contract on any particular tract of land except such overriding royalties as we are already entitled to on the interests delivered to you by L. H. Dunn. In other words, if it becomes necessary, in your judgment, in securing a lease or mineral interest, that you increase the amount of royalty payable thereunder to such an extent as to entirely eliminate any overriding royalty which we would be entitled to on any such tract of land, by reason of the above described contract, you are hereby authorized to do so and we hereby release you from any claim or damage therefor.

"Yours very truly,
"L. H. Dunn
"The Federal Royalty Company,
"By Lee Hager, President."

And on May 20, 1933, the contract of December 22, 1932, was amended, by adding the following words to paragraph "d" of subdivision IV, beginning with the conclusion of "d", before such amendment:

"Second Party has already made contracts with owners of mineral interests in the contract area which provide for royalties in excess of the said Two Dollars ($2.00) per long ton, and First Party ratifies and confirms the action of said Second Party in agreeing to such excess royalty payments, and First Party agrees that in securing additional leases and mineral interests, Second Party is authorized to utilize, if in its judgment it becomes necessary in securing any such lease or interest, all or any part of any overriding royalties which First Party would be entitled to under this contract on any particular tract of land except such overriding royalties as First Party is already entitled to on the interests delivered by First Party to Second Party. First Party specifically takes notice of the fact that Second Party has agreed to pay Texas Gulf Sulphur Company and certain other interests more than the minimum of Two Dollars ($2.00) per long ton royalty, and First Party agrees that he is not entitled to any overriding royalty on any of such interests or that might otherwise accrue to him under the terms and provision hereof by reason of the securing of such interests by Second Party."

Then in April, 1934, the Duval Company sent Dunn a proposed draft of a consummation contract, together with a statement showing the percentages of the sulphur rights which it had acquired (from Dunn or otherwise) in the various tracts within the contract area, which statement also indicated the overriding royalty it proposed to pay Dunn (and associates) on each tract. Upon receipt of such proposed draft and accompanying statement, Dunn notified the Duval Company that, except as to three specified tracts, the proposed overriding royalties were not in conformity with the agreement, and refused to sign such draft.

The evidence showed with respect to practically every tract in the contract area that the Duval Company had bound itself to pay a landowner's royalty in excess of $2 per long ton, after it had taken over the task of acquiring the outstanding sulphur interests. But it is Dunn's contention, and that of all the appellants, that the meaning of the agreement between the parties hereinabove set out, and its modification, is that the Duval Company should pay Dunn and his associates an overriding royalty of $1 per long ton on all sulphur produced and saved from the mineral interests assigned by Dunn to the Company, and that this was not to be reduced on any tract except where the Company had failed to acquire the ownership of the 100% sulphur rights.

At the conclusion of the evidence the Duval Company moved for an instructed verdict. The learned trial court having concluded that there was no issue of fact either of fraud or mutual mistake with respect to the agreements, and that they were free of ambiguity, dismissed the jury and rendered judgment enforcing the construction of the agreements contended for by the Duval Company. That is to say, the court held that Dunn and his associates were not entitled in those instances in which the Duval Company had itself acquired the outstanding interests and paid therefor an

overriding royalty in excess of $2 per long ton to the landowners, after the date of the modification agreement, to an overriding royalty on the basis of $1 per long ton on the percentage of sulphur rights which Dunn had delivered.

We have carefully considered the evidence and have come to the conclusion that there was no evidence of fraud in the case. With reference to the issue of mutual mistake, appellants introduced evidence to the effect that the real agreement between the parties was that the formula for reducing the overriding royalty to be allowed Dunn should not apply where the Duval Company acquired 100% of the sulphur rights, even though it acquired same after the modification agreement and paid more than $2 royalty to the landowner. But this is not enough to warrant the reformation of the contract. Appellant did not prove the terms of the agreement which differ from their version of the true agreement, and which were placed in the agreement by mutual mistake. Sun Oil Company v. Bennett, 125 Tex. 540, 84 S.W.2d 447.

Appellants' contention as to the true construction on the overriding royalty agreement, after its modification, can be made clear by illustration. In a case where Dunn had acquired 50% of the sulphur rights in a tract, and was unable to acquire more, he was entitled by the formula to 50c x 50%, or 25c (i. e., the square of the fractional interest). It is his contention that the true meaning of the modified agreement of May 20, 1933, is that, where the Duval Company acquired the remaining outstanding 50% sulphur rights in such tract, and paid a landowner's royalty therefor in excess of $2, he would then be entitled to an overriding royalty of 50c per long ton, instead of 25c. In other words, after the full interest had been acquired, it is his contention that he was entitled to an overriding royalty which should be equal in cents to the percentage of the sulphur rights he had delivered to the Duval Company out of such tract. There is not only no basis for this construction of the agreement after its modification, when the Duval Company had paid in excess of $2 per long ton to the owner, but such construction is directly contrary to the plain meaning of the language of the agreement.

. The construction herein given the final contracts, as between Dunn and the Duval Company, is thought to also dispose of the subsidiary controversy between the Federal Royalty Company and Davidek and Cloud, the tracts of the latter two having, along with the others in that category, been assigned to the Duval Company at $3 per long ton.

Finding no error, the trial court's judgment should be affirmed, and it is so ordered.

Affirmed.

MONTEITH, C. J., disqualified and not sitting.

On Motions for Rehearing.

CODY, Justice.

On motions for rehearing it became necessary to certify certain questions to the Supreme Court. Through its adoption of an opinion by Hon. J. E. Hickman, Judge of Section A of the Commission of Appeals, on June 4, 1941 (which opinion is reported in 152 S.W.2d 1080), the Supreme Court answered the certified questions favorably to appellees.

As set out in our tentative opinion on motions for rehearing which accompanied the certificate to the Supreme Court, it was our conclusion then that the judgment of the trial court should be modified to the extent of adjudging Davidek and Cloud to each have 10% of a 1/24 overriding royalty in the oil and gas of the lands assigned by Dunn to the Duval Company, and the balance of said 1/24 overriding royalty adjudged to appellants, without passing upon the rights of appellants thereto inter sese.

The Supreme Court's answer to the certified questions in no way affects this conclusion. And, as we still adhere thereto, the judgment of this Court of date May 11, 1939, affirming in toto the judgment of the trial court will here be modified, on our own motion, as of May 11, 1939, as hereinabove indicated. The motions for rehearing filed by the respective appellants will be refused, and it is so ordered.

Because of this error, all costs of appeal will be adjudged against the Duval Texas Sulphur Company, and the trial court costs will remain adjudged as decreed below.

Reformed and affirmed as of May 11, 1939; motion for rehearing by the Federal Royalty Company refused; motion for rehearing by L. H. Dunn et al refused.

MONTEITH, C. J., disqualified and not sitting.